Filed 4/24/15  In re P.B. CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

In re P.B. et al., Persons Coming Under the Juvenile Court Law.

| | |
|---|---|
| RIVERSIDE COUNTY DEPARTMENT OF PUBLIC SOCIAL SERVICES, | E062305 |
| Plaintiff and Respondent, | (Super.Ct.No. RIJ1200926) |
| v. | OPINION |
| S.A., | |
| Defendant and Appellant. | |

APPEAL from the Superior Court of Riverside County.  Tamara L. Wagner,

Temporary Judge.  (Pursuant to Cal. Const., art. VI, § 21.)  Affirmed.

Diana W. Prince, under appointment by the Court of Appeal, for Defendant and

Appellant.

Gregory P. Priamos, County Counsel, and Julie Koons Jarvi, Deputy County

Counsel, for Plaintiff and Repondent.

# I

## STATEMENT OF THE CASE AND FACTS

Mother and father are the parents of six children. On September 4, 2012, a Welfare and Institutions Code[1] section 300 petition was filed: R. was 10 years old, J. was 7 years old; P. was 2 years old; S. was 22 months old; and A. was 9 months old.[2] The petition alleged that the children came within the jurisdiction of the juvenile court under section 300, subdivision (b).

Mother and father were not married but resided together since the children were born. Father is not the biological father of S., but he considered himself to be the father and his name was on S.'s birth certificate. Mother stated that she does not know the biological father's personal information. Both parents apparently had developmental delays.

On August 22, 2012, a social worker interviewed the family after the Department of Public Social Services (Department) received numerous referrals about the family. The children were appropriately dressed but the clothes were dirty and the three youngest had chronic runny noses that had not been cleaned. The children appeared as if they had not been bathed for days. The children had no marks or bruises.

---

[1] All further statutory references will be to the Welfare and Institutions Code, unless otherwise noted.

[2] The last child, C., was not born at this time. He was born during the pendency of this dependency on March 15, 2013. This appeal involves only P. and S.

Mother admitted to drinking two 32-ounce beers on a daily basis. She also admitted to a history of using methamphetamine, which resulted in S. being born positive for amphetamine. Mother stated that she last used methamphetamine in October 2010. Both father and mother tested negative for all substances. Mother admitted to the social worker that S. got out of the property and was found alone on a street corner.

Father and the two oldest children, R. and J., had been sleeping in a trailer in the backyard. J. later informed the social worker that he sometimes slept out in the trailer because there were a lot of people in the house. He stated that he lived with his mother, father, brothers, sister, aunt, uncle, and some other family members.

The social worker inspected the main house; it was large and spacious. All the utilities were in working order, and there was ample food in the house. The social worker also inspected the smaller trailer in the yard. It had a queen mattress on the floor and was full of piles of clothing. The trailer had some windows that were broken. There was a full-size refrigerator outside the trailer; it had minimal provisions of food for the family. The family had cleaned up the yard prior to the social worker's arrival as instructed by law enforcement. The parents signed a safety plan agreeing to keep the property free from hazards. The children were not detained from the parents.

On September 5, 2012, the court found that a prima facie showing was made that the children came within section 300, subdivision (b). The court set a jurisdictional hearing.

On September 26, 2012, the court found true the allegations in the petition with the exception of the b-4 allegation. Physical custody of the children was retained by the parents. Mother and father were provided with family maintenance services. The court set a review hearing.

In a status review report filed on March 12, 2013, the social worker described P. as continuing to develop age appropriately. He was not as verbal as most three year olds and could not fully engage in conversation using at least two to four words at a time. P., however, was able to express his needs and wants, and was very alert and observant. He appeared to be emotionally and mentally stable. He had an appointment to be assessed for developmental delays and for possible services with Inland Regional Center (IRC).

In the report, the social worker reported that S. was developing and functioning within his age range. He showed no signs of mental or emotional concern, and related and played well with his peers. S. also had an appointment to be assessed with IRC.

The social worker reported that mother was pregnant and expecting her sixth child. Three days after the status review report was filed, on March 15, 2013, mother gave birth to C. On March 19, 2013, a section 300 petition was filed alleging that C. came within section 300, subdivisions (b) and (j). On the same date, a section 387 petition was filed as to the five older children to remove them from the parents' care.

Moreover, on the same date, March 19, 2013, two detention reports were filed. One report was for the section 300 hearing for C.; the other report was for the section 387 for the older five siblings. The social worker reported that on March 16, she went to mother and father's house. The maternal aunt told the social worker that the family had

4

been lying to the Department by stating that they lived in the house. The aunt disclosed that the family was living in the trailer. The social worker observed the children. They were covered in dirt, had an odor about them, had runny noses, and had clothes that did not fit. The children were detained.

The parents admitted that they lived inside the trailer. The social worker asked the parents to show her the inside of the trailer. The trailer had a "thick" smell of rotting food and feces. The social worker found rotting food, over 300 soiled diapers lining the floor and walls, and over 40 empty beer bottles. According to the father, the liquid in some of the beer bottles was urine as the family used them as portable potties at night. The family also used the soiled diapers as cushions to pad the comforters that they slept on. There was exposed wiring and open medication bottles within reach of the children. There were no adequate provisions for the newborn baby.

In January 2013, it was discovered during a physical that S. had high levels of lead in his blood, and was suffering from a condition where he constantly put objects such as rocks, metal, and dirt into his mouth and chewed on them. S. lived in an environment which placed him at risk of lead poisoning. Moreover, A., S. and P. had not received any immunizations.

On March 20, 2013, the juvenile court found that a prima facie showing was made that the five older children came within section 387. A contested jurisdictional hearing was set on the section 387 petition.

On April 11, 2013, a "387 jurisdiction/disposition report" was filed. In the report, the social worker reported that P. saw a doctor on April 2, 2013. P. was diagnosed with "failure to thrive, short stature, developmental delay, speech delay and impetigo (skin infection)." P. was three years old, weighed 25 pounds, and was 35 inches tall. He continued to have developmental skills below the normal range for speech and language. However, he was able to express his needs and wants, and was very alert and observant.

As for S., the social worker reported that S. also saw a doctor on April 2, 2013. The doctor diagnosed S. with "failure to thrive, short stature, developmental delay, and speech delay." He was two years old, weighed 20 pounds, and was 30.5 inches tall. He was developing within his age range for some areas of development, but he was below the norm in speech and language development. He was not saying any words yet. Instead, S. babbled.

On April 16, 2013, the trial court found true the allegations in the section 387 petition. The children were removed from the parents' care and the parents were provided with reunification services. P. and S. were placed together in a foster home, and were moved to a new home on May 9, 2013, following an out of home investigation on the prior home.

On October 2, 2013, a six-month status review report was filed. The social worker reported that P. was doing well and thriving in placement. He now weighed 28 pounds and was 37 inches tall. P. was assessed for special education services, and he met the special education eligibility criteria for students with an intellectual disability. His caregiver reported that P. was doing much better using his words, and responding to her

instructions and directions. P. had an individual aid in preschool that helped him with any of his special needs. P. was not meeting class standards. P. had become more verbal and could express his needs without any support.

The social worker reported that S. was also doing well and thriving in placement. He was 25 pounds and 33 inches tall. S. was also assessed for special education services; he met the special education eligibility criteria for students with an intellectual disability. On September 27, 2013, the caregiver reported that S. was doing better with his words and responding to her instructions and directions. S. appeared to be emotionally and mentally stable. He was gradually becoming verbal, but was still unable to express his needs without any support.

The parents did not engage in their case plan services. The foster parents of P. and S. were not interested in adopting them. Therefore, the social worker planned to search for a suitable prospective adoptive placement for them. There was no family member willing or able to adopt the children.

On November 5, 2013, the juvenile court terminated reunification services concerning S. A section 366.26 hearing was set. An additional six months of reunification services were offered to mother as to P.

On February 19, 2014, a section 366.26 and 366.3 (post permanency status review hearing) report was filed as to S. The social worker reported that S. was developing a vocabulary and engaging in more play. He was able to follow directions and requests, such as pointing to familiar toys and people. S. was a special needs child who required

beyond what an average child required. The social worker reported that S. needed a caregiver who was highly stable and "can navigate life and advocate for his needs."

On February 21, 2014, a section 366.21 twelve month status review report was filed as to P. The social worker reported that when P. was four years old, he was described as being not as verbal as other children his age. Also, he could not engage in a conversation using at least three to five words at a time. However, P. was able to express his needs, and was very alert and observant. P. struggled with aggressive behavior. On October 1, 2013, an intake packet was requested for P. to be evaluated for services from IRC. P. was in a special education class in preschool, and had an Individual Education Plan (IEP) assessment meeting on August 21, 2013. P. had an individual aid at school and was not meeting standards. P. was described as emotionally and mentally stable.

On March 5, 2014, the juvenile court terminated services as to P. A section 366.26 hearing was set.

On June 20, 2014, a section 366.3 post permanency plan status review report was filed. In the report, the social worker stated that in May 2014, the caregiver for S. and P. expressed concern with how far behind the boys were with their speech. She requested an "IRC assessment and more speech services." She stated that as P. got older, he was harder to understand. S. appeared to have a speech delay, but appeared on target in other areas.

On July 24, 2014, the juvenile court terminated parental rights as to C. and A. On August 13, 2014, mother filed a notice of appeal. On November 24, 2014, we dismissed the appeal as abandoned. (Case No. E061721.)

8

On August 28, 2014, the prospective adoptive parents of P. and S. participated in a full disclosure over the telephone in relation to the boys. On September 15, 2014, the prospective adoptive parents participated in a full disclosure in person with the children's social worker, and the family's adoption worker. Visitation between the children and the prospective adoptive parents began that same day. The children began to live with the prospective adoptive family on September 19, 2014, and were officially placed in the home on September 25, 2014.

On October 22, 2014, an addendum report was filed. The social worker reported that P. and S. were doing "extremely well" in the prospective adoptive home and that a "strong bond" had developed between the children and the prospective adoptive family. The family was committed to adopting the children, and the family had a fully approved adoption home study. According to the social worker, "the likelihood that the children will be adopted once parental rights have been terminated is extremely high."

On November 3, 2014, the court terminated parental rights as to P. and S.

On November 7, 2014, mother filed her notice of appeal. On appeal, mother claims that the trial court erred in terminating her parental rights. For the reasons set forth below, we shall affirm the trial court's order.

II

ANALYSIS

*The Juvenile Court's Finding That the Children*

*Were Likely to be Adopted Is Supported by Substantial Evidence*

The juvenile court cannot terminate parental rights unless it finds by clear and convincing evidence "that it is likely the child will be adopted . . . ." (§ 366.26, subd. (c)(1).) The focus of the adoptability inquiry is on the child, "and whether the child's age, physical condition, and emotional state may make it difficult to find an adoptive family. [Citations.]" (*In re Erik P.* (2002) 104 Cal.App.4th 395, 400; see also *In re Sarah M.* (1994) 22 Cal.App.4th 1642, 1649.) A proposed adoptive parent need not be identified and ready to adopt, but "there must be convincing evidence of the likelihood that adoption will take place within a reasonable time. [Citation.]" (*In re Brian P.* (2002) 99 Cal.App.4th 616, 624 (*Brian P.*).) "Although a finding of adoptability must be supported by clear and convincing evidence, it is nevertheless a low threshold: The court must merely determine that it is 'likely' that the child will be adopted within a reasonable time." (*In re K.B.* (2009) 173 Cal.App.4th 1275, 1292 [Fourth Dist., Div. Two].)

"'"Usually, the fact that a prospective adoptive parent has expressed interest in adopting the minor is evidence that the minor's age, physical condition, mental state, and other matters relating to the child are not likely to dissuade individuals from adopting the minor. In other words, a prospective adoptive parent's willingness to adopt generally indicates the minor is likely to be adopted within a reasonable time either by the prospective adoptive parent *or by some other family*."' [Citation.]" (*In re Gregory A.*

10

(2005) 126 Cal.App.4th 1554, 1562; see also *In re I.W.* (2009) 180 Cal.App.4th 1517, 1526.)

"On review, we determine whether the record contains substantial evidence from which the juvenile court could find clear and convincing evidence the child[ren] [were] likely to be adopted within a reasonable time." (*In re Michael G.* (2012) 203 Cal.App.4th 580, 589.) It is the parent's "'burden of showing there is no evidence of a sufficiently substantial nature to support the finding or order.' [Citation.]" (*In re Jose C.* (2010) 188 Cal.App.4th 147, 158.)

"In the presence of substantial evidence, appellate justices are without the power to reweigh conflicting evidence and alter a dependency court determination." (*Constance K. v. Superior Court* (1998) 61 Cal.App.4th 689, 705.)

Mother claims that the court erred in finding the boys adoptable. Specifically, mother asserts that the adoption assessment contained outdated information, regional center evaluations were not completed, and inadequate services were provided to address the boys' developmental delays. We disagree.

In this case, P. and S. began to visit their prospective adoptive parents on September 15, 2014, began to live with them four days later, and were officially placed with them on September 25, 2014. Also in the home was their newborn baby sister, C.

According to the adoption assessment report, P. was four years old and suffered from some development delays in speech, cognition, and motor skills. He participated in a special education program and had an IEP. P. exhibited some behavioral issues such as hitting peers and failing to follow directions. He began attending a new preschool on

11

October 13, 2014; his teacher indicated that P. was doing well and more advanced than the other students. P.'s teacher expected that he would transition to a regular classroom in the near future.

The prospective adoptive parents reported that P. was a sweet boy, a quick learner, ate and slept well, and was gentle with his baby sister. P. also learned some sign language.

S. was three years old and also participated in an IEP and exhibited the same behaviors as his older brother, P.[3] S. also began to attend his new preschool on October 13, 2014. His teacher indicated that S. was doing well and more advanced than other students. The teacher expected S. to transition to a regular classroom in the near future. The prospective adoptive parents reported that S. was kind and loving, and he ate and slept well. S. was quickly learning to express his needs without hitting. S. was also gentle with his baby sister.

Mother states that P. and S. were placed with their newborn sister which is problematic because of the boys' history of behavioral issues. The evidence, however, showed that P. and S. were "gentle" with their sister. Under the substantial evidence standard, "we examine the whole record in a light most favorable to the findings and conclusions of the juvenile court and defer to the lower court on issues of credibility of the evidence and witnesses." (*In re Albert T.* (2006) 144 Cal.App.4th 207, 216.)

---

[3] S. turned four years old approximately one week prior to the hearing on review.

Mother also argues that P. and S. are not adoptable, in essence, "[b]ecause their school district assessments are more than a year old, and they never received the regional center assessments the social worker recognized they needed, and they did not receive adequate services as noted by their long-time foster mother." In essence, mother is arguing that the adoption assessment report was inadequate. Under section 366.21, subdivision (i):

"(1) Whenever a court orders that a hearing pursuant to Section 366.26 . . . shall be held, it shall direct the agency supervising the child and the county adoption agency, or the Statement Department of Social Services when it is acting as an adoption agency, to prepare an assessment that shall include . . .

. . .

"(C) An evaluation of the child's medical, developmental, scholastic, mental, and emotional status." (§366.21, subd. (i)(1)(C).)

Here, in the court below, mother never argued that the adoption assessment report was inadequate. Failure to object to the sufficiency of the assessment report waives the issue for appeal. (See *In re Crystal J.* (1993) 12 Cal.App.4th 407, 411-412.) "[A] party is precluded from urging on appeal any point not raised in the trial court. [Citation.]" (*In re Aaron B.* (1996) 46 Cal.App.4th 843, 846.)

Even if mother did not waive the issue regarding the sufficiency of the assessment report, mother's argument fails on the merits. In this case, the section 366.26 hearing was held on November 3, 2014. The preliminary assessment report, which provided details about P. and S., was dated October 2014, just one month prior to the hearing. The

13

report indicated that both boys had recently seen their doctor in October 2014, and P. saw the dentist in September 2014. The boys started a new school in October 2014, and their teacher reported that the boys were more advanced than other students, and it was expected that they would be transitioned to a regular classroom in the near future. Contrary to mother's characterization of the boys, the evidence showed that the boys were adjusting and doing well. Moreover, the record showed that the prospective adoptive parents were provided with "all available background information on the children and their biological parents."

In her reply brief, mother relies on *Brian P.*, *supra*, 99 Cal.App.4th 616, to support her claim. The facts in *Brian P.*, however, are distinguishable from the facts in this case. In *Brian P.*, the court noted that in order to assess adoptability, the court is required to focus on the child, "and whether the child's age, physical condition, and emotional state make it difficult to find a person willing to adopt. [Citations.]" (*Id.* at p. 624.) The court found that "[s]uch evidence was sorely lacking in this case." (*Ibid.*) The court noted that the "juvenile court did not have the benefit of an adoption assessment report, which would have presented the kind of facts needed to support a finding of adoptability." (*Ibid.*) The court then went on to state the references in the record in support of the adoption were "devoid" of any facts about the child in question. The reports said "nothing about his adoptability." (*Ibid.*) The court went on to note that the evidence relied on by the juvenile court "concluded only that [the child] was 'found to be a proper subject for adoption.' The *likelihood* of an adoption was not mentioned. Nor did the

14

child welfare worker supply more facts in her testimony at the hearing. She merely reiterated the Agency's position that [the child] was adoptable." (*Ibid.*)

The facts in this case are different from the facts in *Brian P.*, *supra*, 99 Cal.App.4th 616. As noted above, in the evidence presented to the juvenile court, the social worker reported that both P. and S. were doing well and adjusting to their new home. Both their teachers reported that the boys were more advanced than other students, and it was expected that they would be transitioned to a regular classroom in the near future. As stated previously, "we examine the whole record in a light most favorable to the findings and conclusions of the juvenile court and defer to the lower court on issues of credibility of the evidence and witnesses." (*In re Albert T.*, *supra*, 144 Cal.App.4th at p. 216.)

Furthermore, we note that, in *Brian P.*, *supra*, 99 Cal.App.4th 616, 619, the child was not placed in a prospective adoptive home. Instead, the Agency was looking for an adoptive home for the child. (*Ibid.*) In this case, the evidence showed that P. and S. were placed in an adoptive home with prospective adoptive parents committed to adopting both boys. Even children who ordinarily might be considered unadoptable may be found to be adoptable because a prospective adoptive family has been identified as willing to adopt the children. (*In re Brandon T.* (2008) 164 Cal.App.4th 1400, 1408.) In this case, the prospective adoptive parents are mature and stable individuals who are "very capable" of meeting the physical and emotional needs of P. and S. The family had a well thought out routine to provide the boys with stability and consistency. The children were bonded with their prospective adoptive parents and thrived in the home.

15

Based on the above, we find that substantial evidence supports the juvenile court's finding that P. and S. are likely to be adopted.

III

DISPOSITION

The juvenile court's November 3, 2014, order terminating the parental rights of mother is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

McKINSTER
                                                                                          J.

We concur:

RAMIREZ
              P. J.

KING
              J.